In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-21-00341-CV
IN THE INTEREST OF J.O. JR., T.O., J.O. and W.O.

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-07-08744-CV**

## MEMORANDUM OPINION

After a bench trial, Appellant H.O. ("Mother")[1] appeals the trial court's order terminating her parental rights to her children, J.O. Jr. ("Jason"), T.O. ("Todd"), J.O. ("Julie") and W.O. ("Wendy"). At the time the petition was filed, Jason and Todd were six years old, Julie was four, and Wendy was two. The trial court also terminated the parental rights of the children's father, J.O. ("Father").[2] For reasons explained herein, we affirm the trial court's judgment.

---

[1] To protect the identities of the minors, we use pseudonyms to refer to the children and their family members. *See* Tex. R. App. P. 9.8(b)(2).

[2] Father filed an affidavit of relinquishment stating that he is the children's father, that he gave up his parental rights, and that termination of the parent-child

Background

On July 24, 2020, the Department of Family and Protective Services ("the Department") filed an "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." The petition named Jason, Todd, Julie, and Wendy as the children in the suit, Mother as the children's mother, and Father as Jason's father and "the alleged father" of the other three children.

The petition was supported by an affidavit from a Child Protective Services ("CPS") worker and representative, stating that, on July 15, 2020, the Department received two priority one reports regarding the children. The affidavit summarized both reports. In the first report there were concerns of sexual abuse to the children and a description of what prompted the report.[3] According to the affidavit, the

---

relationship was in the children's best interest. Father is not a party to this appeal. Accordingly, we include limited details about him as necessary to explain the facts.
  [3] The CPS Affidavit stated the following allegations:

ALLEGATIONS

On July 15, 2020 the department received two Priority One referrals for the [] children. The first report stated that there are concerns of sexual abuse to [the children]. The report stated that [Father and Mother] are in the bedroom with the oldest child and that they can be heard telling him to shut up. The report stated that the oldest child can be heard crying and that [Mother] is heard telling him to hold her hands. The report stated that [Mother] can be heard telling [Father] to "pull out" while the child is heard pleading and crying. It was noted that the child could be heard trying to catch his breath during the incident. It was

children were being punished for long periods of times at all hours of the night. The second report to the Department stated that the children were heard crying and screaming during the night and that the parents were always "yelling and cussing" at the children. The report stated that an unrelated male, Wesley, in the home was using methamphetamine with the Mother and using and selling the drugs in the garage next to the children. The report stated that the Father was unaware of Mother's drug use, but when the oldest child, Jason, tried to tell Father, Jason was disciplined. The report also "stated that the children ask for food."

According to the affidavit, the Department representative visited the residence on July 16, 2020, and observed that the children were in dirty and worn clothes, the home was in poor condition with large holes in the walls and exposed insulation, there were stacks of trash and clutter, a dirty mattress with no bedding was in the middle of a room, there were several dogs and reptiles in crates around the home,

---

reported that the children are heard being punished for long periods of time at all hours of the night.
The second report stated that the children can be heard crying and screaming at all hours of the night and that the parents are always yelling and cussing at the children. The report stated that there is an unrelated male, [], in the home and that he is engaging in methamphetamine use with [Mother]. The report stated that [Mother] and the male are using and selling methamphetamines in the garage next to the children. The report stated that [Father] is unaware of [Mother's] use but also stated that the oldest [child] tried to tell [Father] about the use and he was disciplined. The report stated that the children ask for food.

the kitchen cabinets were infested with roaches, and there was "wood attached by screws to the bedroom entrance causing concern that the children were being locked in." Two of the children, Jason and Todd, were unwilling to complete an interview at Children's Safe Harbor and remained quiet in response to the representative's questions.

When the representative asked Mother how the home conditions had deteriorated so quickly since the closure of the last investigation, Mother stated that the children were destructive and had stopped doing their chores. According to the affidavit, Mother denied that Wesley was living in her home, denied any drug use, agreed to submit to a drug test the next day, and denied the allegations of sexual abuse and physical abuse to the children. Father reported that he worked away from home and Mother wanted to party and spend time with Wesley and not parent. He believed Mother might be using marijuana and he admitted that he had smoked marijuana within the last two days. According to the representative, Father became emotional when he discussed that he had started to sleep in a chair because Wesley had been sleeping in his bed with Mother. Father admitted to arguing with Mother and that he had thrown things at her. Father told the representative that he had not removed the children from the environment because he loved Mother. He denied sexually and physically abusing his children. Mother and Father agreed to allow the children to be placed with Mother's parents. The children's maternal grandmother

reported that she believed Mother was "using pills and shooting up." She did not believe that the children should be in Mother's or Father's care.

The affidavit outlined a history of referrals alleging physical abuse, physical neglect, and neglectful supervision of the children by Mother and Father dating back to 2016, with many of the allegations being ruled out or ruled "unable to determine" by the Department. In some cases, services were provided to assist the family and, on at least one occasion and as a result of a November 2019 referral alleging physical neglect of the children by Mother and Father, "CPI staff demonstrated modeling for the family and walked [Mother] through bathing the children and keeping the house clean[]" and a "referral for maternal child network in home services was sent." Ultimately, the case from the November 2019 allegations was "closed with various community resources implemented and referrals sent."

In the affidavit, the Department requested to be named temporary managing conservator of the children because the parents had demonstrated a long-term pattern of chronic physical neglect of the children, and despite the Department's repeated efforts to aid in mitigating the abuse and neglect to the children, the children were "again [] found in conditions [] hazardous to their health, safety, and development along with allegations of sexual abuse."

## Evidence at Trial

<u>Testimony of Lindsay Higdon</u>

Lindsay Higdon testified that she was the Department Caseworker for the case from July 2020 to April 2021. Higdon stated that the initial concerns in the case were "drug use, sexual abuse of the children, and neglect." It was Higdon's understanding that, when the case started, Mother and Father were no longer in a relationship and were living separate lives. The initial primary goal during the case was relative adoption. According to Higdon, she formulated the family plan of service and held a family group conference. Higdon was unable to contact Mother until a few months into the case because Mother did not respond to Higdon's phone calls or letters.

The children were placed with their maternal grandmother and Higdon described the maternal grandmother's house as appropriate, clean, and safe for the children. Higdon believed that the grandmother was committed to the children, and based on Higdon's observations of their interactions, the children were very bonded to the grandmother. According to Higdon, the children and their grandmother had a good relationship, the children seemed to trust the grandmother, and the grandmother was an advocate for them. Higdon described the placement as "ideal for these children."

Higdon stated that Mother had approximately a year to complete the services in her service plan, but Mother did not comply with the plan. Mother's court-ordered

service plan was admitted into evidence. According to Higdon, as part of Mother's service plan she was to obtain and maintain stable employment, stay in contact with Higdon, maintain stable housing, and attend the parent collaboration group. Mother did not comply with any of those requirements. Mother never told Higdon that she was employed. According to Higdon, the service plan required Mother to complete a drug and alcohol assessment and follow the recommendations from the assessment. Although Mother completed the assessment, she did not follow the recommendations. Mother never told Higdon that she had a stable home for Higdon to come visit. Another requirement of Mother's service plan was to complete random drug testing. Mother did not fully comply with the random bi-weekly drug testing and only drug tested once in February 2021 when Higdon was the caseworker. Higdon was aware that a drug test for Mother during the case investigation showed Mother tested positive for amphetamine and methamphetamine, and that when Mother submitted for a urine and hair test on February 23, 2021, Mother tested positive for amphetamine and methamphetamine, but Mother denied using drugs. Under the service plan Mother was to provide Higdon with any information about the boyfriend who had allegedly sexually abused the children, and Mother did not comply. Mother also did not complete psychiatric and psychological evaluations and follow recommendations relating thereto as required by her service plan. Mother participated in individual therapy for about two months but was discharged for

7

noncompliance. According to Higdon, the children did not have visitation with Mother during the case based on the children's therapist's recommendations.

One of the children, Todd, had some mental health problems, and the grandmother had been addressing those problems and made sure he received appropriate services. Todd was admitted into a psychiatric hospital for threats of self-harm and harm to others, was discharged and went back to the hospital less than a month later for another stay, and then he was discharged again. After being stable for a while and on medication and attending therapy, he declined and was admitted again. According to Higdon, there was a discussion about the possibility of placing Todd outside of the grandmother's home until he could be stabilized but the grandmother felt Todd was safest in her home and with his siblings. Higdon testified that she worked with the grandmother and the CASA to set up "intensive wraparound [outpatient] services to be done in the home" so that Todd could stay out of the hospital and keep his education and mental health on track.

According to Higdon, one of the other children, Julie, suffered from thyroid problems and when she was placed at the grandmother's, Julie had already been prescribed thyroid medication but had not been taking it. At the time of removal, all four children were also malnourished and had poor dental health. Higdon testified that the maternal grandmother had addressed the nourishment concerns and dental

problems. According to Higdon, all four children were also in therapy during the time she had the case.

Higdon had no doubt that the grandmother and her husband were committed and loved the children and that the children wanted to be adopted by them. Higdon testified that the maternal grandparents had good plans for the children, and that the grandmother was addressing the children's medical, mental health, educational, and physical needs. At the time she ceased being the caseworker in April, Higdon believed the children felt safe at their grandmother's. According to Higdon, Mother was "pretty much completely noncompliant" with her service plan and Mother had not done anything else during the case to alleviate the concerns they had for the children at the time of their removal.

Testimony of Kassie Sauer

Kassie Sauer testified that she was the Department caseworker for the children for about four months before trial. When she received the case and reviewed it, Mother was not in compliance with her family plan. She was unable to reach Mother the first couple of months at the numbers Mother had provided, but Sauer met with Mother in the month before trial after Mother contacted her. According to Sauer, she called and left voicemails for Mother to be drug tested, but Mother never submitted to drug testing for Sauer. As to Mother's housing situation, Mother told Sauer Mother had a "camper" to live in but said she was about to move it because of a

9

conflict with the person from whom she was renting property. Sauer stated that was the last thing Sauer heard about Mother's housing. Sauer testified that Mother never told her that Mother was ready, willing, and able to have the children back given her housing situation. Although Mother reported to Sauer that she was "scrapping for money" and was working as a caregiver, she never provided Sauer with proof of employment or income.

Sauer talked with the children's grandmother and observed the grandmother interact with the children. According to Sauer, the children were very attached to their grandmother, they were well-bonded with her, and they would "get nervous if they even think you're going to remove them from the [grandmother's] home[.]" Sauer testified that, based on her monthly meetings with the children, her review of the file and the children's therapist's notes, and conversations with Mother and the grandmother, Sauer believed it was in the children's best interest for Mother's parental rights to be terminated. Sauer reached that opinion after considering factors such as the safety of the children, their ability to have a long-term home where they feel safe and are taken to medical appointments, their ability to have a home where they are not abused, and Mother's lack of stability and inability to follow up with Julie's thyroid issues and Todd's behavioral issues. Sauer testified that despite only meeting with Mother one time and talking on the phone with her three or four times, based on everything she felt comfortable saying that Mother should never see her

children again. Sauer also testified that she believed, based on Father's affidavit of relinquishment and the testimony she heard at trial, it was in the children's best interest for Father's parental rights to be terminated.

Testimony of Mother

Mother testified that she and Father married in 2014, after Jason was born. She believed it was in the best interest of the children for Father to relinquish his parental rights because when he came home from his work trips, he "would just [] sit on his video games and scream at [the children] and spank them 24/7." According to Mother, her mother's house was a good place for the children and better than foster care. Mother testified she had no concerns with the children living with her mother.

Mother did not know why Julie had thyroid pills leftover in July when she had been prescribed them in April, and she stated she made sure Julie got her medication every day. At the time of the removal, Mother lived in a trailer her father-in-law said she could live in, and she lived with Father and another man, Wesley. According to Mother, Father and Wesley stayed out in the garage and Wesley, with whom Mother was in a relationship, went to jail. Mother did not believe that any of her children had ever been sexually abused. She testified that Wesley never sexually abused the children because he was never alone with her children. She testified that she was not "a hundred percent sure" about Father though, because he had been around the

children alone plenty of times, she had been told he "used to stare at [her] girls[,]" and she was working at the time.

Mother testified that at the time of removal she did not believe Father was doing drugs and she stated she had never used illegal drugs. She testified that the reason she tested positive in July 2020 on her drug test was because, unbeknownst to her at the time, someone put methamphetamine in Mother's "vape" that she had left out. As for the February 2021 positive drug test, Mother testified that she did not know how she tested positive because she was not using drugs. Mother stated that she was discharged from individual counseling because the counselor did not think she needed the counseling anymore. According to Mother, she had never received anything about the drug and alcohol assessment recommendations, and she was only called for drug testing on three occasions. She testified she did not know she was being called every two weeks, she submitted for two tests, and then on the third time the office was closed.

Mother testified that in October 2020 she moved out of the trailer from which the children had been removed because Father "had shut off the lights." Mother denied that the two dogs seized from that property looked like they did in the photographs which were admitted into evidence. Mother alleged that both dogs "were all fat 'cause [she] was feeding them." She testified that after she left the trailer, she moved in with a friend who lived next door for a few months, and then

12

she stayed with another friend for about three months. After that, she used a stimulus check to buy a camper and vehicle that she put on property she rented from friends. According to Mother, at the time of trial she paid the friend $200 a month to rent the property and about $97 a month for the water bill, and Mother agreed she had not provided the address to her caseworker.

Mother said she was working at Whataburger until August 2020, and then she picked up scrap metal for a company until April 2021. Mother testified that at the time of trial she had worked for two months doing landscaping with a friend and made from $300 to $1000 every two weeks. Mother used some of the stimulus money to buy the children some clothes, but she never gave the clothes to the caseworker because the caseworker told her to hold on to them and Mother never heard back from her. She admitted that during the case she never gave her parents money for the children's care. Mother had not seen the children since August 22, 2020. At the beginning of the case, she did not have contact with the caseworker but when Mother got another phone, she contacted the caseworker and they met. Mother had an email address but was locked out of her email until shortly before trial. According to Mother, the caseworker said she would send her for drug testing but never contacted Mother about it. Mother stated she had more than three caseworkers during the case. According to Mother, she never informed the Department that Wesley was her boyfriend because "[t]hey never asked[.]" She acknowledged she

13

had not completed the psychiatric or psychological evaluations. Mother agreed she was arrested for pending charges related to the dogs in July. Mother stated she has known about Todd's behavior issues since he was two and a half years old, but a doctor told her that Todd could not be diagnosed until he was six. Mother stated that Todd would throw his brother's kitten against the wall, and he choked and hit Mother.

Mother believed her children should be returned because, "except for the parenting class, [she was] doing everything that [the Department was] asking." According to Mother, her camper can sleep eight people and it is a safe and clean environment for her children, but if her children were returned to her, she would sell the camper and get a different place. She testified she was still working doing landscaping and makes enough money to support her children. She stated that she had a vehicle, but it was not running, and it would cost $45 for repairs. She had talked to her mother a few times during the case but had not seen the children, and she was concerned that if her parental rights were terminated, she would not ever get to see them.

Testimony of the Children's Maternal Grandmother

The grandmother, Mother's mother, testified that the four children had been placed with her and lived with grandmother and grandmother's husband of twenty-nine years. Mother's eighteen-year-old sister and her two children also live in the

home, and the sister had no criminal or CPS history. The grandmother testified that Mother's children were bonded with Mother's sister's children. According to the grandmother, Mother's children also lived with her in 2017 for about a month after CPS became involved and the children were removed because of neglect and the "house situation."

According to the grandmother, she previously had a good relationship with Mother and had helped with the children, but her relationship with Mother changed after the children were removed. Prior to removal, the grandmother told Mother "quite a few times that [the children] didn't look good[]" and the grandmother also felt the house was "not in proper health for the children to be in."

Grandmother testified that both Father and Mother abused their children. According to the grandmother, she had witnessed Mother "hit them in the back of their heads, push[] them to the ground, [and] put them in their room where they can't get out." When she witnessed this, she brought the children to her house to stay for a few days. Grandmother knew Mother used drugs because Mother's friends had told her that they had watched Mother use drugs. The year before trial, the grandmother noticed Mother "was acting really funny" and the grandmother "knew [Mother] was on something[,]" but when she asked Mother if she was on drugs, Mother denied it. According to the grandmother, she had no reason to believe at the time of trial that Mother was clean and sober and, based on what the grandmother

15

saw during the year prior to trial, Mother's behavior was consistent with her being on drugs.

When the children were removed and placed with grandmother, they had suffered from malnutrition and neglect. The grandmother explained that because the children had not been fed properly, she spent four and a half weeks at the doctor's office with the children and had to involve different medical professionals to help the children. At the time of placement with the grandmother, the children also had scabies, bedbug bites, and upper respiratory infections. The grandmother testified that when the children were placed with her, Julie's hair "was almost completely gone[]" in one area.

The children were doing well in her home at the time of trial, and they had all gained weight and Julie's hair had grown back. According to the grandmother, Julie had always had a thyroid issue, and while living with her grandmother she had been on her medicine and doing fine. Todd had been hospitalized six or seven times, twice in the two months prior to trial. The grandmother testified that just prior to one of the hospitalizations, Todd and Jason had run away to meet up with Mother, and they were found with the help of law enforcement. There was no indication that they had run away because of the grandmother or grandfather but rather due to "outside influences[.]" After the incident and an investigation by law enforcement, the grandmother looked into obtaining a restraining order against Mother to make sure

16

she did not attempt to "come around the house at any time to try to grab the kids." The grandmother testified that she and her husband were committed to meeting Todd's special needs.

Grandmother and her husband wanted to adopt the children and she believes that their adoption was the best solution for the children's permanency. She believed that termination of both Father's and Mother's parental rights was in the children's best interest. The grandmother testified that if the children "go back with [Mother], that they won't be here no more. That they're going to be really abused."

The grandmother believed that it was important for the children to be together, and she was committed to the children and especially to Todd with his psychiatric needs. The grandmother testified that the children called her "Momma" because she "has been with them for so much[,]" they want to stay, and "[t]hey are scared to death if anybody says [the] Mom or Dad's name." The grandmother had been taking the children to therapy, believed it helped the children, and planned on continuing to take them to therapy. She followed the therapist's recommendations to not allow the children to see their parents. According to the grandmother, the children's reactions to things like hearing their parents or seeing a car or something that made them believe their parents were coming to get them caused them to "wet[] on the[m]selves[]" and caused bad nightmares. The grandmother testified she was

17

prepared to not allow the children to have contact with their parents if ordered by the court.

The grandmother explained that she planned on being involved and continuing to help the children with their education. She testified that since their placement with her, the children have made improvements in their education and in their medical and dental health.

Testimony of the Court-Appointed Special Advocate (CASA)

The CASA testified that he was appointed as guardian ad litem for the children and has been their guardian ad litem throughout this case. He has had many conversations and visits with the children in their current placement, has spoken with their therapist and reviewed her notes, and received information from the Department about the children and Mother's service plan. According to the CASA, the difference between the children at the beginning of the case and the time of trial was "striking[,]" and they felt comfortable in their current placement. The CASA has witnessed a consistent improvement in the children's behavior as a result of the counseling and the grandparents' care. The CASA noted that the children's grandmother took the children to their doctor, dental, and therapy appointments and the CASA had no concerns about the grandmother's ability to protect and meet the children's needs. He testified that even when the boys ran away and with Todd's

hospitalizations, the grandmother and her husband had been supportive and acted in what they believed was in the children's best interest.

The CASA had tried to contact Mother but received a recording that her number was not receiving phone calls. The CASA had concerns about Mother's drug use, the children's safety, and their physical, mental, and emotional well-being if they were returned to Mother. The CASA stated that the photographs of inside the home admitted at trial concerned him because the photographs show "an immense amount of clutter[.]" The CASA believes that Mother's parental rights should be terminated because the children need consistency and need to feel safe.

The CASA recommended that it was the children's best interest to stay in their current placement and that Mother's and Father's parental rights be terminated. The CASA also recommended that it was in the children's best interest for the Department to be the children's managing conservator if parental rights were terminated. According to the CASA, appointing either parent as a managing conservator would significantly negatively impact the physical and emotional welfare of the children.

Testimony of Deputy Kenneth Dougherty

Deputy Kenneth Dougherty with the Montgomery County Precinct 5 Constable's Office testified that he was the officer assisting animal control that was called out to Mother's home on October 8, 2020, on a seizure warrant for two dogs

19

on the property. Officer Dougherty testified that he observed a dog with ribs and spine visible and the dog was chained to a tree without food or water nearby. He testified that the outside of the house was not taken care of, and there was a pile of trash that smelled of decay and a pile of scrap metal in the yard, and the conditions were hazardous to the children.

Testimony of Sergeant Ryan Simpson

Sergeant Ryan Simpson with the Montgomery County Precinct 5 Constable's Office testified that he was called out in October 2020 to Mother's house to assist animal control in seizing animals. Sergeant Simpson testified that the outside and inside of the home was unkept, there was a dog with its ribs visible chained outside and a dog inside in a crate standing in its feces, and inside there was property strewn about and a pungent mildew-like smell. Both dogs were seized. As Sergeant Simpson walked through the home he was concerned about "contact with animal refuse" inside and outside the dog cage in the house and "food particles and things…that had not been cleaned." Photographs of the conditions of the dogs and the home were admitted into evidence.

Drug Test Results

Several exhibits admitted at trial reflect that Mother tested positive for methamphetamine and amphetamine on July 17, 2020, and on February 23, 2021.

## Issues Stated by Appellant

In issues one, two, and three, Mother challenges the legal and factual sufficiency of the evidence supporting termination of Mother's parental rights under section 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. In issue four, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that terminating Mother's parental rights was in the children's best interest. In issue five, Mother argues the trial court erred in appointing the Department as permanent managing conservator.

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief

or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved the disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## Statutory Grounds D and E

In her first two issues, Mother challenges the sufficiency of the evidence to support termination of her parental rights under sections 161.001(b)(1)(D) and (E)

of the Texas Family Code. As to subsection D, Mother argues that although the Department offered some evidence regarding concerns with the condition of the home, the evidence is factually insufficient as to whether the conditions or surroundings endangered the physical or emotional well-being of the children. Mother contends that Sergeant Simpson's and Deputy Dougherty's testimony about the home's condition offered no support for termination under either section because their visit to the home was "approximately seventy-six days" after the Department filed its petition and after the removal of the children, and "[t]he relevant time frame under this subsection is prior to the child's removal." Mother argues that the grandmother failed to offer testimony about the meaning of "proper health" when she testified that the home was "not in proper health for the children to be in[,]" and she did not provide a definite timeframe for this observation. As for the photographs of the home admitted into evidence, Mother contends that there was no confirmation that the pictures were taken at a time that the children were living in the home or any explanation as to how those conditions posed a danger to the children. She also argues that the evidence did not rise to a level of clear and convincing evidence that the children were in danger when Father was in town and that she testified that she had no reason to believe the children were ever sexually abused or that the father was using any drugs. As to subsection E, Mother argues that there is no evidence to support a finding that she endangered her children and that although the Department

23

offered positive drug test results for Mother, no evidence was offered that any alleged drug use by her endangered her children. According to Mother, there was no explanation by the grandmother as to what she meant when she testified that the children suffered from "malnutrition" or "neglect," Mother testified that she sought medical care for children, her testimony that Father would scream at the children and "spank them 24/7" did not rise to the level of clear and convincing evidence that the children were in any danger when Father was in town, and she testified that she had no reason to believe that the children were ever sexually abused or that Father was using drugs.

We are required to consider the sufficiency of the evidence pursuant to Sections 161.001(b)(1)(D) or (E) if challenged. *In re N.G.*, 577 S.W.3d 230, 235-36 (Tex. 2019). If the evidence is sufficient as to one of these, it will not be necessary to address the other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is all that is necessary to affirm a termination judgment. *Id.* at 232-33. Because the evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *33 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). "'[E]ndanger' means to expose to loss or injury[.]" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—

24

Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—

25

Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under subsection E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In addition, a pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't*

*of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of her child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). Further, a factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because she was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Allowing a child to live in unsanitary conditions supports a finding that the parent has endangered the child's physical and emotional well-being. *See In re A.T.*, 406

S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied); *see also In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions…may prove endangerment."). The child "need not develop or succumb to a malady due to th[e] [unsanitary] conditions before it can be said that" the child was endangered. *In re P.E.W.*, 105 S.W.3d at 777.

The trial court had evidence that Mother tested positive for methamphetamine and amphetamine on two occasions, and that she failed to submit to drug testing every two weeks as required by her service plan. Even though Mother testified the Department never contacted her to drug test except for three occasions, the trial court could have disbelieved Mother and could have reasonably inferred that Mother's failure to submit to the testing was because she was avoiding the test because she was using illegal drugs. *See In re E.R.W.*, 528 S.W.3d at 265. The trial court heard the grandmother's testimony that Mother's behavior during the case was consistent with drug use and that Mother's friends told the grandmother that Mother used drugs.

The trial court had before it the affidavit from the Department representative that stated that at the time of the children's removal, the children were in dirty and worn clothes, the home was in poor condition with large holes in the walls and exposed insulation, there were stacks of trash and clutter, a dirty mattress with no bedding was in the middle of a room, there were several dogs and reptiles in crates around the home, the kitchen cabinets were infested with roaches, and there was

"wood attached by screws to the bedroom entrance causing concern that the children were being locked in." The trial court heard testimony from Deputy Dougherty that in October 2020, the outside of the house was not taken care of, with a pile of trash that smelled of decay and a pile of scrap metal in the yard that were hazardous to the children. The trial court heard testimony from Sergeant Simpson that in October 2020 the outside and inside of the home was unkept, there was a dog with its ribs visible chained outside and a dog inside in a crate standing in its feces, and inside there was property strewn about and a pungent mildew-like smell. He also testified that when he was walking through the home he was concerned about "contact with animal refuse" inside and outside the dog cage in the house and "food particles and things…that had not been cleaned." The trial court heard the CASA's testimony that the photographs admitted at trial of the home concerned him because they showed "an immense amount of clutter" that could be dangerous for young children. Also, the trial court could have reasonably concluded from testimony and from the photographs admitted at trial of the home that the children were living in unsanitary conditions or that the home's environment was dangerous for the children.

The trial court heard testimony from Higdon that at the time of the removal the children were malnourished and had poor dental health. The trial court heard testimony that when Julie was placed with her grandmother, Julie had not been given her thyroid medication as prescribed and had an area of missing hair while in

Mother's care. The trial court heard testimony from the grandmother that prior to removal she told Mother several times that the children "didn't look good" and that the house was "not in proper health for the children to be in." The trial court heard the grandmother's testimony that because the children had not been fed properly, she spent four and a half weeks at the doctor's office with the children and had to involve different medical professionals to help the children. The trial court also heard the grandmother testify that when the children were placed with her, they had scabies, bedbug bites, and upper respiratory infections.

The trial court heard the grandmother testify that she believed both Father and Mother abused their children. The trial court heard testimony that prior to the children's removal, the grandmother witnessed Mother "hit them in the back of their heads, push[] them to the ground, put them in their room where they [couldn't] get out[,]" and then the grandmother brought the children to her house to stay for a few days.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the findings under subsections D and E, as we must, the trial court could reasonably have formed a firm belief or conviction that Mother, through her individual acts or omissions or a course of conduct, endangered the children's physical or emotional well-being. We conclude that the Department established, by clear and convincing evidence, that Mother committed

30

the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Mother endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266. We need not address the sufficiency of the evidence to support a violation of subsection O. *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.). We overrule issues one and two, and we decline to address issue three.

## Best Interest of the Children

In issue four, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating Mother's parental rights was in the children's best interest. Specifically, Mother argues that "[t]he best interest evidence offered to support termination of mother's parental rights was scant, at best[,]" and "[c]onclusory evidence is insufficient."

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann.

§ 153.131(b). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family member and friends is available to the child. *Id.* § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the

child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse of the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental rights may be in the child's best interest when a parent is unable to provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

As for the desires of the children, the trial court heard testimony from one of the caseworkers that the children wanted to be adopted by the maternal grandparents. The trial court heard the grandmother, the caseworkers, and the CASA testify that the children are bonded with their grandmother. The trial court heard the grandmother's testimony about the children's reactions to things like hearing their parents or seeing a car or something that made them believe their parents were coming to get them and it caused the children to "wet[] on [them]selves[]" and have bad nightmares. The trial court heard one of the caseworkers testify that the children

34

"get nervous if they even think you're going to remove them from the [grandparents'] home[.]" The trial court heard testimony that the children's therapist recommended that the children should not have visitation with Mother.

Regarding the children's emotional and physical needs now and in the future and the stability of the home of the proposed placement, the trial court heard one of the caseworkers testify that the grandmother was properly caring for the children, they felt safe with her, and she was addressing their medical, mental health, educational, and physical needs. The trial court heard the caseworker testify that the grandparents' home was appropriate, clean, and safe, and that the placement was "ideal for these children." The trial court heard the caseworker testify that she worked with the grandmother to set up services in the home to help keep Todd's mental health on track and to keep him out of the hospital, and that the grandmother had been addressing Todd's mental health concerns. The trial court heard from the caseworkers, the grandmother, and the CASA that the children's physical conditions had improved while in the grandparents' care and the children's needs were being met. The trial court heard testimony from the grandmother that she planned on being involved in the children's education. These factors weigh in favor of terminating Mother's parental rights.

As to the parental abilities of the parent seeking custody, the evidence showed that despite assistance from the Department in the past during a prior investigation,

Mother's home conditions continued to deteriorate. Positive drug tests from Mother at the time of removal and during the case were admitted into evidence. The trial court heard one of the caseworkers testify that Mother was "pretty much completely noncompliant" with her service plan, Mother did not submit to bi-weekly drug testing, Mother did not complete individual therapy, Mother did not follow recommendations from the drug and alcohol assessment, Mother did not complete psychiatric and psychological evaluations, and Mother never provided proof of employment or stable housing. This factor weighs in favor of terminating Mother's parental rights.

Regarding the plans for the children, the trial court heard one of the caseworker's testimony that the goal during the case was relative adoption, that the maternal grandparents had good plans for the children, and that the grandmother was addressing the children's medical, mental health, educational, and physical needs. The trial court heard the grandmother's testimony that she and her husband wanted to adopt the children and were committed to meeting their needs. The trial court heard a caseworker, the CASA, and the grandmother testify that termination of Mother's parental rights and adoption by the maternal grandparents would be in the children's best interest. This factor weighs in favor of terminating Mother's parental rights.

Regarding Mother's acts or omissions, Mother denied using drugs, despite testing positive for drugs two times during the case. The trial court heard the grandmother's testimony that she witnessed Mother physically abuse the children and that she had told Mother several times before their removal that the children "didn't look good." The trial court had before it photographs of the home during the case and the affidavit from the Department representative at the time of removal describing the unsanitary condition of the home. This factor weighs in favor of terminating Mother's parental rights.

Having considered the evidence related to the best interest of the children and deferring to the trial court's determinations on witness credibility, the resolution of conflicts of evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307; *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is in the children's best interest.

### Appointment of Department as Permanent Managing Conservator

In issue five, Mother argues the trial court erred when it appointed the Department as the children's permanent managing conservator. Mother argues that

37

although the trial court made a general finding that it was in the children's best interest that the Department be appointed as the permanent managing conservator, the trial court failed to make the specific findings necessary under section 153.131 of the Texas Family Code.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We will reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or unreasonable. *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless that court finds that such appointment would not be in his best interest "because the appointment would significantly impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131(a).

As discussed above, sufficient evidence supports the trial court's termination of Mother's parental rights as to the children, and Father's rights were likewise terminated. When the parents' rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator. *See id.* § 161.207; *In re N.T.*, 474 S.W.3d at 480-81. Section 161.207(a) provides, "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and

Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). We cannot conclude that the trial court abused its discretion by appointing the Department as the children's managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re N.T.*, 474 S.W.3d at 480-81. We overrule issue five.

We affirm the trial court's order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 1, 2022
Opinion Delivered March 17, 2022

Before Golemon, C.J., Horton and Johnson, JJ.